**RECORD NO. 09-5315**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

# IONA D. CALHOUN,

*Plaintiff – Appellant*,

**v.**

# BART BUSH, Administrator,
# United States General Services Administration,

*Defendant – Appellee*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————

## PAGE PROOF BRIEF OF APPELLANT

—————————

Ari Taragin
*James L. Fuchs
Michael J. Snider
SNIDER & ASSOCIATES, LLC
104 Church Lane, Suite 100
Baltimore, Maryland  21208
(410) 653-9060

*Counsel for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant believes oral argument is necessary for resolution of this appeal.

## <u>CERTIFICATE OF INTERESTED PERSONS<br>AND CORPORATE DISCLOSURE STATEMENT</u>

Comes Now, Appellant, Iona D. Calhoun, by her undersigned counsel, pursuant to

FRAP 26.1 and files the following CERTIFICATE OF INTERESTED PERSONS

AND CORPORATE DISCLOSURE STATEMENT:

The following persons, attorney, association of persons, firm, law firm, partnership,

and corporation that has or may have an interest in the outcome of this action:

Calhoun, Iona

Feldman, Allan Esq.

Fuchs, James Esq.

Kaufman, Keith Esq.

Snider and Associates, LLC

Snider, Michael J. Esq.

Statman, Jacob Esq.

Taragin, Ari Esq.

Weisbrot, Jason Esq.

<div style="margin-left:50%">

/s/ James L. Fuchs

James L. Fuchs, Esq.

Snider & Associates, LLC

104 Church Lane, Suite 100

Baltimore, Maryland  21208

410-653-9060

410-653-9061 fax

Attorney for Appellant

</div>

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT...............................................ii

TABLE OF CONTENTS.........................................................................................iii

TABLE OF AUTHORITIES ..................................................................................vi

JURISDICTIONAL STATEMENT .........................................................................1

ISSUES ON APPEAL .............................................................................................2

STATUTES AND REGULATIONS........................................................................3

STATEMENT OF THE CASE.............................................................................12

STATEMENT OF THE FACTS ...........................................................................14

    THE COMPUTER SPECIALIST PRESELECTION OF TOKEY
    BRADFIELD ...............................................................................................14

    MR. WHITSON'S "SUGGESTION" WAS AN ORDER ............................17

    ALTHOUGH MR. WHITSON HAD NO BASIS FOR KNOWING
    THE APPLICANT LIST, HE DID KNOW THAT TWO HIGHLY-
    QUALIFIED, ELIGIBLE CANDIDATES WERE AFRICAN-
    AMERICAN WOMEN, ONE OF WHOM WAS MS. CALHOUN ............18

    MS. PETERSON-PARKER WAS QUALIFIED TO EVALUATE
    BOTH MS. CALHOUN'S AND MS. BRADFIELD'S ABILITIES
    AND CREDENTIALS, SINCE SHE HAD ACTED BOTH AS MS.
    BRADFIELD'S FORMER SUPERVISOR AND AS MS.
    CALHOUN'S COLLEAGUE, WITH SIMILAR DUTIES .........................18

MS. PETERSON-PARKER VIEWED MS. CALHOUN AS THE
SUPERIOR CANDIDATE...........................................................................19

MS. PETERSON-PARKER, WHO FACTUALLY SUPPORTED
HER CONCLUSIONS CONCERNING THE THREE
CANDIDATES' QUALIFICATIONS AND ABILITIES, DIRECTLY
DISPUTED MR. WHITSON'S CONCLUSORY ASSERTION
THAT MS. BRADFIELD WAS THE SUPERIOR CANDIDATE..............25

MS. PETERSON-PARKER BEARS NO ANIMUS TOWARDS MS.
BRADFIELD, BUT BELIEVES THAT THE SELECTION
PROCESS WAS INFORMED BY DISCRIMINATORY FACTORS ........26

MS. BRADFIELD, THE ONLY CANDIDATE OF THE THREE
FINALISTS WHO WAS NOT AN AFRICAN-AMERICAN
WOMAN, WAS THE LEAST QUALIFIED OF THE THREE...................26

MS. CALHOUN SCORED HIGHER RATINGS THAN THE
SELECTEES IN TWO OF THE THREE PROGRAM EXPERT
SEARCHES ................................................................................................28

DEFENDANT'S CONCLUSORY REMARKS DO NOT
DEMONSTRATE THAT MR. HOLSTROM AND MR.
BURMEISTER WERE MORE QUALIFIED TO SERVE IN THE
POSITION OF PROGRAM EXPERT THAN WAS MS. CALHOUN .......29

APPELLEE HAS NOT ESTABLISHED THAT MS. MCDONALD
WAS SUPERIOR TO MS. CALHOUN AS A CANDIDATE.....................31

DEFENDANT HAS FAILED TO PRODUCE RELEVANT
DOCUMENTS, WHICH DEFENDANT PROMISED TO MAKE
AVAILABLE, CONCERNING THE NON-SELECTIONS ........................32

SUMMARY OF THE ARGUMENT .....................................................................34

STANDARD OF REVIEW AND SUMMARY JUDGMENT ...............................37

ARGUMENT & ANALYSIS ...................................................................41

    I.      Ms. Calhoun has established a *Prima Facie* Case of
            Discrimination on the Bases of her Race, Age, and Reprisal ............41

    II.     Ms. Calhoun has established a *Prima Facie* Case of Reprisal ..........45

           A.      A causal connection exists between Ms. Calhoun's filing
                    of an EEO Complaint, along with her Union activity, and
                    the subsequent non-selections ...................................................46

           B.      Ms. Calhoun has Shown Retaliation Vel Non .........................48

    III.    Ms. Calhoun Has Established Disparate Treatment............................49

    IV.    Ms. Calhoun Has Demonstrated Disputes of Fact, Which
            Should be Decided by a Jury.................................................................50

    V.     According to the Law of this Circuit, Ms. Calhoun's Vastly
            Superior Qualifications Provide a Basis for Defeating Summary
            Judgment ...........................................................................................53

    VI.    An Adverse Inference Should Be Drawn from Appellee's
            Failure to Answer Interrogatories or Provide Documents over
            the Course of Years ............................................................................58

CONCLUSION ...................................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970)..................................................................... 38-39

*\*Aka v. Washington Hosp. Center*,
   156 F.3d 1284 (D.C. Cir. 1998).............................................40, 53, 55, 56, 57

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)....................................................................37, 38, 39

*Brown v. Brody*,
   199 F.3d 446 (D.C. Cir. 1999)......................................................49

*Byers v. Burleson*,
   713 F.2d 856 (D.C. Cir. 1983)......................................................51

*Carter v. George Washington Univ.*,
   387 F.3d 872 (D.C. Cir. 2004).....................................................42, 45

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)....................................................................37, 38, 39

*Desert Palace, Inc. v. Costa*,
   530 U.S. 90 (2003)......................................................................40

*Furnco Constr. Corp. v. Waters*,
   438 U.S. 567 (1978)....................................................................42

*\*George v. Leavitt*,
   407 F.3d 405 (D.C. Cir. 2005)....................................... 39, 40, 43, 44, 49, 50

*Holbrook v. Reno*,
   196 F.3d 255 (D.C. Cir. 1999)......................................................50

*\* Denotes Authorities Chiefly Relied Upon*

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006)................................................37, 46, 47, 53, 54

*Insurance Corp. of Ireland v. Compayne Des Bauxites*,
    456 U.S. 694 (1982)................................................................................58

*International Broth. of Teamsters*,
    431 U.S. 324 (1977)................................................................................50

*\*Jones v. Bernanke*,
    557 F.3d 670 (D.C. Cir. 2009)................................................37, 45, 48, 49

*\*Lathram v. Show*,
    336 F.3d 1065 (D.C. Cir. 2003)................................................................54, 55

*Mastro v. Potomac Elec. Power Co.*,
    447 F.3d 843 (D.C. Cir. 2006)................................................................37

*McConnell v. Howard University*,
    818 F.2d 58 (D.C. Cir. 1987)................................................................51

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)................................................................39, 41, 42, 45

*McKenna v. Weinberger*,
    729 F.2d 783 (D.C. Cir. 1984)................................................................47

*Nyhus v. Travel Management Corp.*,
    466 F.2d 440 (D.C. Cir. 1972)................................................................53

*Reeves v. Sanderson Plumbing Prods.*,
    530 U.S. 133 (2000)................................................................37, 38, 39

*Salazar v. Wash. Metro. Area Transit Auth.*,
    401 F.3d 504 (D.C. Cir. 2005)................................................................37

*Sherwood v. Washington Post*,
    871 F.2d 1144 (D.C. Cir. 1989)................................................................51, 52, 53

*Stella v. Mineta*,
  284 F.3d 135 (D.C. Cir. 2002)...............................................................49, 50

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) ...........................41-42

*Teneyck v. Omni Shoreham Hotel*,
  365 F.3d 1139 (D.C. Cir. 2004)..................................................................50

*\*Texas Dept. of Community Affairs v. Burdine*,
  450 U.S. 248 (1981)...................................................................38, 39, 41

*Toney v. Bergland*,
  645 F.2d 1063 (D.C. Cir. 1981).................................................................52

*Troy Corp. v. Browner*,
  120 F.3d 277 (D.C. Cir. 1997)...................................................................39

*Tygrett v. Washington*,
  543 F.2d 840 (D.C. Cir. 1974)...................................................................52

*United States v. Hoffman*,
  964 F.2d 21 (2d Cir. 1992) ........................................................................58

*Waterhouse v. District of Columbia*,
  298 F.3d 989 (D.C. Cir. 2002)...................................................................40

*Weldon v. Kraft, Inc.*,
  896 F.2d 793 (3d Cir. 1990) ......................................................................44

*Wiley v. Glassman*,
  511 F.3d 151 (D.C. Cir. 2007)...................................................................45

## **STATUTES**

28 U.S.C. § 1291 ...............................................................................1, 7, 9

28 U.S.C. § 1331 ...................................................................................1, 3

29 U.S.C. § 621 ..............................................................................1, 3, 14

42 U.S.C. § 2000e ...........................................................................1, 4, 14

## **RULES**

Fed. R. App. P. 3 ..................................................................................1, 7

Fed. R. Civ. P. 52(a) ...............................................................................51

Fed. R. Civ. P. 56 ...................................................................................10

Fed. R. Civ. P. 56(c) ...............................................................................37

## <u>JURISDICTIONAL STATEMENT</u>

The district court had federal-question subject-matter jurisdiction under 28 U.S.C. § 1331 because Appellant's Complaint (JA__) was brought under the Age Discrimination in Employment Act (ADEA) 29 U.S.C.A. § 621 and Title VII of the Civil Rights Act of 1964 as amended by 42 U.S.C. § 2000e.  This Court has appellate jurisdiction over this appeal pursuant to Fed. R. App. P. 3 and 28 U.S.C. § 1291 because the district court entered an order and memorandum opinion granting Appellee's motion for summary judgment, which disposed of all Appellant's claims, on August 12, 2009, and, as such, was a final order. The Appellant filed a timely notice of appeal on September 3, 2009.

## ISSUES ON APPEAL

1.    Did the United States District Court for the District of Columbia erroneously conclude that there is no issue of fact in an employment discrimination, non-selection, case in which the selecting official for a position in dispute testified that the selectee—who was the only non-African-American in a group of three finalists—was the least qualified of the three finalists?

2.    Did the United States District Court for the District of Columbia erroneously conclude that there is not an issue of fact in an employment discrimination, non-selection, case in which the selecting official for a position in dispute testified that the selectee had been pre-selected?

3.    Did the United States District Court for the District of Columbia erroneously conclude that there is no dispute of material fact in an employment discrimination, non-selection, case, in which the selecting official's supervisor told the selecting official that a non-African-American applicant was more qualified than African-American applicants and potential applicants, even before the application process had closed?

4.    Did the United States District Court for the District of Columbia erroneously hold that there were no issues of fact in a case in which the Defendant withheld documents over the course of several years?

## <u>STATUTES AND REGULATIONS</u>

28 U.S.C.A. § 1331

## § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

29 U.S.C.A. § 621

## § 621. Congressional statement of findings and purpose

**(a)** The Congress hereby finds and declares that--

> **(1)** in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;

> **(2)** the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;

> **(3)** the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;

> **(4)** the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.

**(b)** It is therefore the purpose of this chapter to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.

42 U.S.C.A. **§ 2000e. Definitions**

For the purposes of this subchapter--

**(a)** The term "person" includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers.

**(b)** The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

**(c)** The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

**(d)** The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

**(e)** A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to

work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization--

> **(1)** is the certified representative of employees under the provisions of the National Labor Relations Act, as amended [29 U.S.C.A. § 151 et seq.], or the Railway Labor Act, as amended [45 U.S.C.A. § 151 et seq.];

> **(2)** although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

> **(3)** has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

> **(4)** has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

> **(5)** is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

**(f)** The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

(**g**) The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

(**h**) The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 [29 U.S.C.A. § 401 et seq.], and further includes any governmental industry, business, or activity.

(**i**) The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act [43 U.S.C.A. § 1331 et seq.].

(**j**) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

(**k**) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided*, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

(***l***) The term "complaining party" means the Commission, the Attorney General, or a person who may bring an action or proceeding under this subchapter.

**(m)** The term "demonstrates" means meets the burdens of production and persuasion.

**(n)** The term "respondent" means an employer, employment agency, labor organization, joint labor-management committee controlling apprenticeship or other training or retraining program, including an on-the-job training program, or Federal entity subject to section 2000e-16 of this title.

## Federal Rules of Appellate Procedure Rule 3, 28 U.S.C.A. § 1291

United States Code Annotated Currentness

Federal Rules of Appellate Procedure (Refs & Annos)

Title II. Appeal from a Judgment or Order of a District Court

## Rule 3. Appeal as of Right–How Taken

**(a) Filing the Notice of Appeal.**

**(1)** An appeal permitted by law as of right from a district court to a court of appeals may be taken only by filing a notice of appeal with the district clerk within the time allowed by Rule 4. At the time of filing, the appellant must furnish the clerk with enough copies of the notice to enable the clerk to comply with Rule 3(d).

**(2)** An appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal.

**(3)** An appeal from a judgment by a magistrate judge in a civil case is taken in the same way as an appeal from any other district court judgment.

**(4)** An appeal by permission under 28 U.S.C. § 1292(b) or an appeal in a bankruptcy case may be taken only in the manner prescribed by Rules 5 and 6, respectively.

**(b) Joint or Consolidated Appeals.**

> **(1)** When two or more parties are entitled to appeal from a district-court judgment or order, and their interests make joinder practicable, they may file a joint notice of appeal. They may then proceed on appeal as a single appellant.

> **(2)** When the parties have filed separate timely notices of appeal, the appeals may be joined or consolidated by the court of appeals.

**(c) Contents of the Notice of Appeal.**

> **(1)** The notice of appeal must:

>> **(A)** specify the party or parties taking the appeal by naming each one in the caption or body of the notice, but an attorney representing more than one party may describe those parties with such terms as "all plaintiffs," "the defendants," "the plaintiffs A, B, et al.," or "all defendants except X";

>> **(B)** designate the judgment, order, or part thereof being appealed; and

>> **(C)** name the court to which the appeal is taken.

> **(2)** A pro se notice of appeal is considered filed on behalf of the signer and the signer's spouse and minor children (if they are parties), unless the notice clearly indicates otherwise.

> **(3)** In a class action, whether or not the class has been certified, the notice of appeal is sufficient if it names one person qualified to bring the appeal as representative of the class.

> **(4)** An appeal must not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice.

> **(5)** Form 1 in the Appendix of Forms is a suggested form of a notice of appeal.

8

**(d) Serving the Notice of Appeal.**

    **(1)** The district clerk must serve notice of the filing of a notice of appeal by mailing a copy to each party's counsel of record--excluding the appellant's--or, if a party is proceeding pro se, to the party's last known address. When a defendant in a criminal case appeals, the clerk must also serve a copy of the notice of appeal on the defendant, either by personal service or by mail addressed to the defendant. The clerk must promptly send a copy of the notice of appeal and of the docket entries--and any later docket entries--to the clerk of the court of appeals named in the notice. The district clerk must note, on each copy, the date when the notice of appeal was filed.

    **(2)** If an inmate confined in an institution files a notice of appeal in the manner provided by Rule 4(c), the district clerk must also note the date when the clerk docketed the notice.

    **(3)** The district clerk's failure to serve notice does not affect the validity of the appeal. The clerk must note on the docket the names of the parties to whom the clerk mails copies, with the date of mailing. Service is sufficient despite the death of a party or the party's counsel.

**(e) Payment of Fees.** Upon filing a notice of appeal, the appellant must pay the district clerk all required fees. The district clerk receives the appellate docket fee on behalf of the court of appeals.

## 28 U.S.C. § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**Fed. R. Civ. P. 56. Summary Judgment**

**(a) By a Claiming Party.** A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim.

**(b) By a Defending Party.** A party against whom relief is sought may move, with or without supporting affidavits, for summary judgment on all or part of the claim.

**(c) Time for a Motion, Response, and Reply; Proceedings.**

> **(1)** These times apply unless a different time is set by local rule or the court orders otherwise:

> > **(A)** a party may move for summary judgment at any time until 30 days after the close of all discovery;

> > **(B)** a party opposing the motion must file a response within 21 days after the motion is served or a responsive pleading is due, whichever is later; and

> > **(C)** the movant may file a reply within 14 days after the response is served.

> **(2)** The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

**(d) Case Not Fully Adjudicated on the Motion.**

> **(1)** *Establishing Facts.* If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts--including items of damages or other relief--are not genuinely at issue. The facts so specified must be treated as established in the action.

(**2**) *Establishing Liability.* An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages.

**(e) Affidavits; Further Testimony.**

(**1**) *In General.* A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

(**2**) *Opposing Party's Obligation to Respond.* When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

**(f) When Affidavits Are Unavailable.** If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(**1**) deny the motion;

(**2**) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(**3**) issue any other just order.

**(g) Affidavit Submitted in Bad Faith.** If satisfied that an affidavit under this rule is submitted in bad faith or solely for delay, the court must order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt.

## STATEMENT OF THE CASE

Ms. Iona D. Calhoun, the Appellant, an employee of the U.S. General Services Administration (the "Agency"), was spurned for a position concerning which the selecting official testified that she was the most qualified candidate. Although Ms. Calhoun has an MA in computer sciences, and was doing work at the GS-14 level, the Agency turned her down in favor of Tokey Bradfield, a former secretary who, according to the selecting official, had been preselected for that position.  (JA__, Peterson-Parker Deposition ("PD"), p. 135).  The same selecting official testified both that Ms. Calhoun was the most qualified candidate for this position, and that Ms. Bradfield, the only non African-American candidate, was the least qualified.  (JA___, PD, p. ___).  Ms. Calhoun was also not selected for two other positions concerning which she was more qualified than the selectees. Appellee justifies the selections on the basis of conclusory affidavits.

On May 27, 2009, after numerous discussions concerning documents that Appellant had been seeking from Appellee for years had broken down, Appellant filed a Motion to Compel.  Said motion was still pending at a point in which the only Court-sanctioned deadlines for discovery and dispositive motions elapsed. Appellee filed a motion for summary judgment based on a schedule that had not been agreed to in advance by either Appellant or the district court.  Since Appellant despaired of ever receiving the documents in question, and since Appellee's

motion for summary judgment was filed months after the only Court-sanctioned date, Appellant moved for an immediate trial.

Despite Appellee's failure to meet its discovery obligations, the district court denied immediate trial, and granted Appellee's motion for summary judgment on Appellant's Title VII non-promotion and ADEA claims.  Ms. Calhoun has appealed because she has met her *prima facie* tests for age and race discrimination, she was qualified for the subject positions under the original vacancy announcements, she was more qualified than the selectees, and the Appellee's non-discriminatory legitimate reasons were false and pretextual.   Ms. Calhoun also provided other examples of the hostile work environment, to which she had been subjected for more than 20 years, including the lack of training opportunities, unequal awards, and continual denigration from her supervisors.  Thus, the district court erred in granting summary judgment in Appellee's favor.

## STATEMENT OF THE FACTS

The Appellant, Iona Calhoun, an African-American woman who is over 40 years of age, was not selected for a position in which the selecting official testified that Ms. Calhoun was the most qualified candidate.  The selectee, the only non-African-American finalist, was, according to the same selecting official, the least qualified.  Ms. Calhoun alleges that she has suffered (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. Section 2000e *et seq.*; (2) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Section 621 *et seq.*; and (3) reprisal in violation of Title VII and ADEA.

Long before Appellee had passed over Ms. Calhoun, Appellee had acknowledged her considerable skills by assigning her such tasks as giving seminars, writing policies, and speaking to interagency groups. (JA__, Deposition of Iona Calhoun ("CD"), p. 6).  Appellee had also assigned her work at the GS-14 level, even though Appellant's rank was at the GS-13 level.

## THE COMPUTER SPECIALIST PRESELECTION OF TOKEY BRADFIELD

In December 15, 2000, Ms. Calhoun, who has an MA in computer sciences, applied for the position of Computer Specialist, a GS-14 position.  As the purported selecting official has testified, another candidate, Tokey Bradfield, who

14

had been a secretary (JA___, EEO Hearing Transcript ("HT"), pp. 118-119, 121), had been preselected for that position. (*See Id.* at 135).

The purported selecting official, Wanda Peterson-Parker, testified that, at a point in which her own supervisor, Paul Whitson, should not have even seen any applications with respect to this position—because the application process had not closed—(*See Id.* at 134), he called her into his office to inform that he had already concluded that Ms. Bradfield was the most qualified candidate. At this point, Mr. Whitson was also Ms. Calhoun's supervisor, and thus knew of her EEO complaint. (JA, Notice of Personnel Action ("PA). Mr. Whitson was also aware of the extensive time that Ms. Calhoun spent on Union activities as Union President, although she always endeavored to balance her duties. (JA___, CD, p. 10-11).

Mr. Whitson informed Ms. Peterson-Parker that he would be on vacation when the application process would close, but that "I think that Tokey [Ms. Bradfield] is the best qualified person for the job." (*Id.*).

Ms. Peterson-Parker was unequivocal in her view that Ms. Bradfield had been preselected:

> Q. Do you think that Ms. Bradfield was pre-selected for the position by Ms. Woodson.[1]

---

[1] The transcript mistakenly refers to Mr. Whitson as Paul Woodson.

15

A.  I think she was, otherwise he wouldn't have made that statement
to me.

(*Id.*).

Ms. Peterson-Parker took this as a directive to see if she could follow

directions.  (*Id.* at 136).  Further, Ms. Peterson-Parker testified that she felt that she

might "have been retaliated against" had she complained, in view of her previous

experience of having been "blackballed" after having filed an EEO complaint:

Q. Did you feel that you may have been retaliated against had you
complained?
A. It's very possible, because I have been in the past.[2]
Q. What do you mean that you've been in the past?
A.  Well, for example, when I filed my EEO complaint—when I
expressed that I was not being compensated as far as the same grade
level as my other associates on the team, I was blackballed.  And
evidence of that is my performance rating subsequent to having been
told that.
Q. Did you fear that would occur again if you complained about it?
A. It was possible, because all of the managers were still—the senior
managers were still in place at the time.
Q. And was that the reason you did not go with the—
A. That was the reason. . . .

(*Id.* at pp. 136-137).

---

[2] As the Court will note, lines 20-22 in this transcript seem consistently out of
order.

## <u>MR. WHITSON'S "SUGGESTION" WAS AN ORDER</u>

Nor did Ms. Peterson-Parker leave any doubt concerning her view that Mr.

Whitson's "opinion" was an order:

> Q. Did you take Mr. Woodson's statement as a suggestion or an
> order?
> A. I took it—he looked at me—we sat across from each other and he
> looked at me and he said that I think that Tokey is the best qualified
> for the position.
> Q. Why did you take that as an order as opposed to a suggestion to
> you?
> A. I'll give you an example.  It's something that we refer to as
> emotional intelligence.  You're able to feel a person out after having
> worked with them for a while.  And sometimes you don't have to
> work with them for a while.  But, I had worked with Paul long enough
> to know what he meant.
> Q. And what did you take his direction to mean?
> A. He said that—it implied to me that he wanted me to select Tokey
> for the job.

(*Id.* at pp. 137-138).

Mr. Whitson notably did not tell Ms. Peterson-Parker that she was free to

use her own judgment, or that she was even free to wait until the selection process

had closed.  In fact, even the Human Relations employee handling the file, Patricia

Lewis, appeared to be prepared to accept the applications before the application

process had closed, and Ms. Lewis' abruptness appeared to Ms. Peterson-Parker as

"a further indication that the job was for Tokey."  (*See Id.* at pp. 139-141).

## ALTHOUGH MR. WHITSON HAD NO BASIS FOR KNOWING THE APPLICANT LIST, HE DID KNOW THAT TWO HIGHLY-QUALIFIED, ELIGIBLE CANDIDATES WERE AFRICAN-AMERICAN WOMEN, ONE OF WHOM WAS MS. CALHOUN

Further, although Mr. Whitson was not supposed to have viewed the applicant pool, and thus could have no legitimate basis for determining that Ms. Bradfield was the best qualified candidate, he "surely knew who was eligible and who could apply for the position." (JA___, HT, p. 207). Any GS-13 was eligible to apply (*id.*), and the eligible list would thus have necessarily included Ms. Calhoun and Ms. Boddie, both of whom are African-Americans. (*Id.*). Further, of those employees whom Mr. Whitson oversaw, Ms. Calhoun and Ms. Boddie were the candidates who appeared to be sufficiently qualified to apply for the Computer Specialist position. (*See id.* at p. 208).

## MS. PETERSON-PARKER WAS QUALIFIED TO EVALUATE BOTH MS. CALHOUN'S AND MS. BRADFIELD'S ABILITIES AND CREDENTIALS, SINCE SHE HAD ACTED BOTH AS MS. BRADFIELD'S FORMER SUPERVISOR AND AS MS. CALHOUN'S COLLEAGUE, WITH SIMILAR DUTIES

As a selecting official, Ms. Peterson-Parker was in a particularly favorable position to evaluate Ms. Calhoun's qualifications against Ms. Bradfield's. In 2000, the year in which both Ms. Calhoun and Ms. Bradfield applied for the Computer Specialist position, Ms. Peterson-Parker was supervising Ms. Bradfield, and altogether had supervised her for "at least five years." (JA, HT, pp. 117-118).

Ms. Peterson-Parker could concomitantly evaluate Ms. Calhoun's work and

abilities because she and Ms. Calhoun had both worked on "Information Resources

Procurement and Management Reviews," with "the same set of responsibilities,"

albeit on different teams.  (*Id.* at p. 125).  In commenting on those responsibilities,

*Ms. Peterson-Parker noted that Ms. Calhoun had been doing the work of a GS-14*:

> Q. Was she [Ms. Calhoun] doing the same work that you and other
> GS-14s were doing?
> A. Other than the fact that I was a virtual deputy, I would say yes.

(*Id.* at 126).

## MS. PETERSON-PARKER VIEWED MS. CALHOUN AS THE SUPERIOR CANDIDATE

In evaluating Ms. Calhoun against Ms. Bradfield as a candidate for the

Computer Specialist position, Ms. Peterson-Parker considered Ms. Calhoun to be

the superior candidate with respect to all the factors that were to be considered in

selecting a candidate for the Computer Specialist position.  With respect to Factor

Number One, knowledge of internet and Federal Information Technology policies,

principles, and guidance,[3] Ms. Peterson-Parker, who, after all, had signed on as the

selection official, considered Ms. Calhoun "very strong in this area:"

> Based on my observation of Ms. Calhoun and the fact that we had
> common projects from time to time and her responsibilities, I felt she

---

[3] Undoubtedly aware of Ms. Calhoun's vastly superior qualifications for this position, Appellee, despite having filed 41 exhibits, including vacancy announcements for other positions, did not include in its exhibits the vacancy announcement for this position.

was very strong in this area.  For example, as I mentioned, when we
worked on the Information review the packet when making your
Resources Procurement and Management reviews, we were
responsible for going out to various federal agencies in the immediate
area and throughout the country to determine how well they were
performing in accordance with these policies.  So for that reason
alone, we had to know the Federal Information policies, principles and
guidance.  We were versed in those because we had to speak
intelligently about those when we met with folks from other agencies.
 . . . and if I'm not mistaken, Ms. Calhoun was responsible for establishing
something web-based for the chief information officer's council.

(*Id.* at pp. 145-146).

By comparison, according to Ms. Peterson-Parker, Ms. Bradfield "fell

short:"

Q. Can you compare Ms. Calhoun's qualifications for that first
ranking there as opposed to Ms. Bradfield's?
A. I would say that Ms. Bradfield's fell short as far as the Federal
Information Technology policies, principles and guidance were
concerned because she really didn't have to know that.  She didn't
have to exercise it or demonstrate it, based on my observation. . .[4]

(*Id.* at pp. 146-147).

Further, in a scale of zero to 100, in terms of that first factor, Ms. Peterson-

Parker would assign Ms. Calhoun a score of 90, and Ms. Bradfield a score of 60:

THE ADMINISTRATIVE JUDGE:  The question, as I recall it, is that
on a scale of zero to 100, with 100 being the person most qualified,
can you identify where the complainant and the selectee would fall?
THE WITNESS:  I would say Iona, Ms. Calhoun, a 90.  I would say
Ms. Bradfield-I'll give her a 60 in this instance.  She knew the internet
and over time she would learn the policies, principle and guidance.

---

[4] Ms. Bradfield was better on the internet, but would simply post information.  *Id.*

Q. So if you could just explain why you stated just previously that Ms. Calhoun was a 90, in your own opinion, and what led you to have Ms. Bradfield, the selectee, a 60?

A. Because for years Ms. Calhoun was required to know the Federal Information Technology's policies, principles and guidance well enough to speak about them orally in interviews with senior officials in federal agencies and well enough to write about them in the documentation we had to produce to render our reports to management. . . Ms. Bradfield, on the other hand, primarily worked on the computer and wasn't really responsible for oral communications or writing anything, other than, let's say, PowerPoint presentations. And that was because that information was provided to her to input into the system. The system being a computer.

(*Id.* at pp. 152-154; *see also* JA___, PD, pp. 22-23).

Ms. Peterson-Parker additionally viewed Ms. Calhoun as more qualified with respect to the third ranking factor, demonstration of the ability to provide guidance and assistance to inter-agency committees, other constituencies in support of government-wide activities:

A. Iona was highly qualified based upon the work she had done for years. Again, we started out with the Information Resources Procurement and Management Reviews. And I believe prior to having worked with her, they were responsible for reference management-type functions in which they also worked for agencies. Again, Iona had to be well-versed in her oral communication and written skills because we had to go out and conduct interviews with senior management and other professionals at other agencies. We had to come back and document those interviews, write up our findings and recommendation, and present that to management.

Q. Okay. And if you compare that to Ms. Bradfield's qualifications for quality ranking factor number three?

A. Tokey did not have to perform this type of work.

Q. And how do you know that? Can you give an example of why she would not have to do that?

21

A. Because the assignments she had been provided did not require
that. She was not required to provide guidance and assistance for
governmental activities. The majority of what Ms. Bradfield did was
internal to the Office of Information Technology in support of reports,
as far as maintaining our web page, as far as preparing for the
quarterly performance reviews.

(*Id.* at pp. 160-162).

In fact, with respect to Ms. Bradfield's qualifications with respect to this

factor: to wit, ability to provide guidance and assistance to inter-agency

committees and other constituencies, Ms. Peterson-Parker testified that Ms.

Bradfield had actually *refused* to address an inter-agency group:

Q. And did Ms. Bradfield ever refuse to communicate with other
agencies:
A. In essence, I had Tokey, when I was managing the division as a
team leader. Again, I had supervisory responsibilities, but I did not
provide performance ratings. We were having a meeting and I wanted
Tokey to address the group. She refused to do so. And I think it was
because Tokey was insecure with her oral communication skills. So,
you know, I said, Tokey, will you please address the group? And it
was a very small task. Granted there were 100 people in the room, but
I said, Tokey, would you do this. She said no. I said, okay, I'll see
you back at the office. So she went back to the office and the rest of
us remained at the facility.

(*Id.* at p. 162).

As Ms. Peterson-Parker had explained in her deposition, this was a program

in which "we had to invite people from industry to come and serve as speakers,"

and "[w]e had to recruit speakers from various federal agencies." (JA__, PD, p.

28). In this context, "I would ask Tokey to do certain aspects of communicating

22

with others, and she refused to do it." (*Id.*). The problem was not that Ms.

Bradfield did not want to speak publicly, but that "Tokey was not a

communicator." (*Id.*).

Were Ms. Peterson-Parker to assign Ms. Calhoun and Ms. Bradfield

rankings in this category, Ms. Peterson-Parker testified that she would assign Ms.

Bradfield a 40, and Ms. Calhoun a 95, because "no one is perfect." (JA___, HT, p.

163).   Thus, Ms. Calhoun was "far better qualified than Ms. Bradfield." (*Id.* at

164).

Ms. Calhoun had also demonstrated the ability to provide guidance and

assistance to committees:

> A. Ms. Calhoun had to assist senior management in establishing—I'm
> going to say a subgroup of the chief information officer's council.  I
> don't recall exactly when that was.  In addition, we would have
> meetings with the Office of Information Technology.  Iona would
> professionally stand and address the group during any occasion she
> was required or desired to do so.

(*Id.*).

With respect to the fourth ranking factor, ability to communicate effectively,

orally and in writing, Ms. Peterson-Parker would assign Ms. Calhoun a ranking of

100, and Ms. Bradfield a ranking of 50.  (*Id.* at pp. 165-167).  In addition to the

fact that "[a]nything that I have seen Ms. Bradfield write would not be what was

required of a 14" (*id.* at p. 165), Ms. Peterson-Parker did not even know whether,

"when she [Ms. Bradfield] was a secretary . . . if she prepared common

correspondence or not." (*Id.*).  Ms. Bradfield "didn't perform that function well," and "she wasn't required to do any writing."  (*Id.*).

In contrast, Ms. Calhoun's training highly equipped her to communicate orally and in writing, as Ms. Peterson-Parker knew, since they performed similar duties.  (*Id.* at p. 166).  Ms. Calhoun was also "tasked with developing subgroups to the chief information officer's council." (*Id.*).  Such tasks "were not required of Tokey."  (*Id.*).

Ms. Calhoun was therefore vastly superior to Ms. Bradfield with respect to three of the four factors, and on a par with Ms. Bradfield with respect to the fourth. As a consequence, Ms. Peterson-Parker would assign Ms. Calhoun a score of 100, and Ms. Bradfield a score of 50:

> Q. Okay.  So then if you have to give a score of one to 100 for both complainant and selectee, where would you rank them?
> A. In this regard, I would give—based upon the experience gained over the years and the requirements of these qualifications, I would give Ms. Calhoun 100 and I would say I would give Tokey 50 percent, because she had to do oral communications within the office of Information Technology.  And whatever writing she did have to do wasn't for, let's say, a larger audience, as Ms. Calhoun's was.

(*Id.* at p. 167).

## MS. PETERSON-PARKER, WHO FACTUALLY SUPPORTED HER CONCLUSIONS CONCERNING THE THREE CANDIDATES' QUALIFICATIONS AND ABILITIES, DIRECTLY DISPUTED MR. WHITSON'S CONCLUSORY ASSERTION THAT MS. BRADFIELD WAS THE SUPERIOR CANDIDATE

Ms. Peterson-Parker also directly disputed Ms. Whitson's conclusory statements in which he asserted that Ms. Bradfield was the most qualified candidate, including his conclusory assertion that Ms. Bradfield had the ability to work as a GS-14. She testified that Ms. Bradfield was not doing the work of a GS-14. (JA__, HT, pp. 175-176). Nor, contrary to Mr. Whitson's conclusory statement, had Ms. Bradfield been previously performing similar work, albeit at a different grade level. (*Id.* at pp. 176-177). While Ms. Peterson-Parker agreed with Mr. Whitson's tacit acknowledgment that Ms. Calhoun had superior academic credentials, she disagreed with Mr. Whitson's conclusory statement that Ms. Calhoun lacked Ms. Bradfield's depth of experience. (*Id.* at pp. 177-179).

Ms. Peterson-Parker disagreed with Mr. Whitson's conclusory assertion that Ms. Bradfield was the "standout candidate for that position," but believes that Ms. Calhoun was the standout candidate for that position. (*Id.* at 179).

Thus, Ms. Peterson-Parker refuted, with specific examples and analysis, point by point, Mr. Whitson's conclusory statements concerning Ms. Calhoun's and Ms. Bradfield's credentials. The only other testimony asserting that Ms.

25

Bradfield's credentials superiors was superior to that of Ms. Calhoun's was that of HR specialist Patricia Lewis, who merely "provided the referral list of names," and who made no recommendation.  (*Id.* at 139).

### MS. PETERSON-PARKER BEARS NO ANIMUS TOWARDS MS. BRADFIELD, BUT BELIEVES THAT THE SELECTION PROCESS WAS INFORMED BY DISCRIMINATORY FACTORS

Nor was Ms. Peterson-Parker motivated by animus against Ms. Bradfield, since "I think highly of Ms. Calhoun and Ms. Bradfield."  (*Id.* at p. 131).

### MS. BRADFIELD, THE ONLY CANDIDATE OF THE THREE FINALISTS WHO WAS NOT AN AFRICAN-AMERICAN WOMAN, WAS THE LEAST QUALIFIED OF THE THREE

Ms. Bradfield, the only one of the three finalists who was not African-American, was the least qualified of the finalists, while Ms. Calhoun was the most qualified.  (JA__, TH,  pp. 167-168; JA__, PD, p. 31).  Hence, there was discrimination.

> . . . So the question is, on top, do you believe that selection was impacted by race, gender, or retaliation?  You said I know Tokey is not best qualified.  The other two are African-Americans.  If all candidates received the same treatment, the most qualified person would have been selected.  I did as Paul instructed me to do so.  Do you recall making that statement?
> A. Yes.

(*Id.* at p. 204).

Moreover, Ms. Peterson-Parker ultimately believed that Mr. Whitson might have retaliated against her if she had not selected Ms. Bradfield, because he had

discriminated against her in the past by having denied her training "very much

related to my job . . . (*Id.* at p. 205). Ms. Peterson-Parker subsequently learned that

Mr. Whitson had allowed a Caucasian female to take the same training, in Las

Vegas, for no apparent reason. (*Id.*). Ms. Peterson-Parker testified that "I think it

was discriminatory" (*id.* at 206), and this discriminatory context and

discriminatory consideration propelled her to select Ms. Bradfield:

> A. My previous or prior EEO background led me to make the decision
> as I was directed to by Paul Woodson.

(*Id.* at p. 214). Thus, "when I made the selection, objectivity had nothing to do

with it really. I did what I was told." (*Id.* at p. 215). Ms. Peterson-Parker so acted

because of the environment of discrimination at the Agency. (*Id.*). She also

testified, at her deposition, that the preselection of Ms. Bradfield could have been

racially motivated, although she faltered somewhat, as the district court noted, in

testifying against the Agency. (JA__, PD, Exhibit 4, p. 33). Ultimately, however,

Ms. Peterson-Parker was inclined to suggest a discriminatory motive, because Mr.

Whitson "was aware of everyone in the organization . . . that was qualified, and

even more qualified than she, for that job. Now, what senior management does at

that level, I don't know." (*Id.*).

Nonetheless, "Ms. Bradfield was the least qualified person for the position,

but no one asked me that. . ." (*Id.*, at p. 21). The reason is that Ms. Bradfield

lacked communication skills, IT skills, and interaction skills:

27

A. There are certain expectations as to one's communication skills, IT skills, one's ability to interact with senior officials within the agency as well as outside agency, and Ms. Bradfield did not have those skills.

(*Id.* at p. 22;  JA__, Affidavit of Wanda Peterson-Parker,  dated April 15, 2005

("PA").

## <u>MS. CALHOUN SCORED HIGHER RATINGS THAN THE SELECTEES IN TWO OF THE THREE PROGRAM EXPERT SEARCHES</u>

With respect to two other non-selections, Ms. Calhoun was the superior candidate, as demonstrated by (1) HR rankings; and (2) Appellee's conspicuous failure to produce documents.  Appellee accordingly relies upon bald, conclusory assertions in justifying its selection of all three candidates.

Ms. Calhoun received higher ratings than the selectees of two separate vacancy announcements for the position of Program Expert, Kenneth Holstrom (the selectee of Vacancy Announcement 030008903MP, advertised from July 28, 2003 to August 8, 2003) and George Burmeister (the selectee of Vacancy Announcement 040019503MP, advertised from February 25, 2004 to March 9, 2004).  Appellee clearly considers ratings to be important because Appelle stated, with respect to a third selection, that the selectee received a higher rating than did Ms. Calhoun.  (JA__, DM,  p. 18).  Given Mr. Langfeld's conclusory testimony, the fact that Ms. Calhoun received higher ratings is significant.

In addition to having received higher ratings than both Mr. Holstrom and Mr. Burmeister (JA___, CD,  pp. 64-65, 84-87),[5] Ms. Calhoun, unlike Mr. Holstrom, had been in the division for a couple of years, and had been doing the work of her GS-14 peers.  (*Id.* at p. 65).  Ms. Peterson-Parker has corroborated this.[6]

### DEFENDANT'S CONCLUSORY REMARKS DO NOT DEMONSTRATE THAT MR. HOLSTROM AND MR. BURMEISTER WERE MORE QUALIFIED TO SERVE IN THE POSITION OF PROGRAM EXPERT THAN WAS MS. CALHOUN

Mr. Holstrom had been in a different division, PBS (*see id.* at pp. 65-66), and there is no evidence that his previous work was directly related to that which he was doing for the position for which he was selected, notwithstanding Mr. Langfeld's bald assertions.  Further, the position in question involved policy work, and Ms. Calhoun had been doing policy work for more than 20 years.  (*Id.*).  As has been stated above, Ms. Peterson-Parker testified to just how effectively Ms. Calhoun had been doing that policy work.  In contrast, Appellee, apart from such conclusory statements as "Langfeld 'selected the best qualified candidate based on their experience in Government real estate, and their knowledge, skills, and

_____

[5] Ms. Calhoun received a score of 91.6, and Mr. Burmeister received a score of 91.49.  (*See Id.* at pp. 86-87).

[6] Mr. Langfeld commented, without any documentation, that a position description in which Ms. Calhoun is listed as being at a GS-14 level is a typographical error.  It is not clear why the Agency would have allowed such a mistake to occur without making efforts to correct it.

abilities related to Government real estate,'" and "Holstrom had twenty-nine years of real property experience," (JA___, DM,  p. 16), has provided no basis for concluding that the real estate experience in which Mr. Holstrom was involved is even apposite to the position in question, particularly in view of the policy demands of that position.

Appellee, in conclusory fashion, noted that "Mr. Langfeld found Mr. Burneister's [sic] abilities 'far superior' to those of the other candidates."  (JA__, DM, p. 17).  Appellee refers to Mr. Holstrom's and Mr. Burmeister's respective resumes, but fails to clarify just what aspects of Mr. Burmeister's resume Appellee considers relevant to the position, or why he does, with the exception of a conclusory paragraph in which Mr. Langfeld stated that Mr. Burmeister had been "the Contracting Officer's Technical Representative ('COTR') on IT projects related to Real Property."  (JA___, DM,  p. 44).  Interestingly, Mr. Langfeld's denied Ms. Calhoun IT training on the purported grounds that the training was irrelevant to her work.

Mr. Burmeister's resume provided the extremely vague statementthat he had "[p]articipated in most aspects of the Real Estate program at General Services Administration," and he cited his knowledge of various acts, the relevance of which is unclear.  (JA___, DM, Exh. 32, p. 7).

30

The sharpest distinction between Ms. Calhoun and, respectively, Mr. Holstrom and Mr. Burmeister it that Mr. Holstrom and Mr. Burmister are both white males, while Ms. Calhoun is an African-American woman.[7]  Particularly given Ms. Calhoun's higher rankings than the rankings of either of these white males, Appellee's bald assertions concerning Mr. Holstrom's and Mr. Burmeister's purportedly "far superior" credentials is suspect.  Equally suspect was Mr. Langfeld's decision to cancel Vacancy Announcement 040019503MP, when Mr. Burmeister declined the position, on the purported grounds that "the remaining candidate pool did not have the real property experience that [he] was seeking" (JA__, DM, p. 17), when Ms. Calhoun possessed considerable policy experience and had been ranked highly by Human Resources.

## APPELLEE HAS NOT ESTABLISHED THAT MS. MCDONALD WAS SUPERIOR TO MS. CALHOUN AS A CANDIDATE

The selectee for Vacancy Announcement 040035103MP—a position that was announced, as Defendant implicitly admits, because Mr. Langfeld had no intention of selecting Ms. Calhoun, was Virginia McDonald, a white female.  Yet, Defendant has also not established that Ms. McDonald was superior to Ms.

---

[7] Mr. Langfeld claimed that Ms. Calhoun had misrepresented her GS level on her resume, and that she had included an assignment in which she had performed poorly.  He failed to provide the relevant documents and examples, and Ms. Calhoun has categorically denied these assertions.  Further, Mr. Langfeld's accusation makes no sense, since Ms. Calhoun was aware of who would be reviewing her application.

Calhoun as a candidate.  If Defendant will insist that Ms. McDonald's higher HR ranking makes Ms. McDonald the superior candidate, Defendant must concede that Ms. Calhoun's higher HR rankings, when compared to the rankings of Mr. Holstrom and Mr. Burmeister, establish Ms. Calhoun as the superior candidate.

Appellee claims that "McDonald had twenty-two years of real estate experience." (JA__, DM, p. 18).  Neither this experience, not Ms. McDonald's work on the Bush-Chaney Transition Team, appear to be apposite to the Program Expert position, concerning which Ms. Calhoun's policy experience was highly applicable.  In fact, Appellee's remarks concerning Ms. McDonald's non-real estate experience are inconsistent with Appellee's claims that Ms. Calhoun's policy experience is irrelevant.  (JA___, DM, p. 18).

## DEFENDANT HAS FAILED TO PRODUCE RELEVANT DOCUMENTS, WHICH DEFENDANT PROMISED TO MAKE AVAILABLE, CONCERNING THE NON-SELECTIONS

For over two years, Defendant has failed to produce documents relevant to the non-selections that Defendant claimed that it would make available for inspection.  These documents would illuminate the selection process.  (*See* JA___, Appellant's Motion to Compel, Interrogatory 2).  Appellant had promised to answer Interrogatories for any vacancy announcement that Ms. Calhoun could

"specifically identify" (*id.*), but never did.[8]  After 20 years of abuse, a farce of a

non-selection, and constant evasions by Appellee, Appellee refused even to meet

the most modest discovery obligations.

---

[8]The circumstances that Appellant withdrew the motion in moving for an immediate trial, when Appellee's deadline for dispositive motions had elapsed, are described in JA__ (Facciola Hearing Transcript), pp. ___).

## SUMMARY OF THE ARGUMENT

The district court erred in granting Appellee's motion for summary judgment on Ms. Calhoun's Title VII non-promotion and ADEA claims. (JA__, Judge's Memorandum Opinion ("JM")). Ms. Calhoun demonstrated that she was the most qualified candidate, according to the selection official, and that the only non-African-American candidate was the least qualified, and was preselected. Yet, the district court relies upon a conclusory, post-facto affidavit by the selecting official's supervisor, Paul Whitson. (JA__ JM, p. 8). The district court acknowledges that Ms. Calhoun is better educated than the selectee (*id.*), but takes at face value Mr. Whitson's unsubstantiated assertion that Ms. Calhoun lacked Ms. Bradfield's "depth of experience." (*Id.*).

The district court then erroneously states that Ms. Calhoun "in no way addresses Mr. Whitson's stated reasons for hiring Bradfield," (*id.* at 9), when Ms. Calhoun in fact juxtaposed against Mr. Whitson's assertions detailed statements by the selecting official, Ms. Peterson-Parker, as to why Mr. Whitson's assertions were false. (JA___, Appellant's Opposition "AO", pp. ___).

Also, the district court, in a footnote, asserted—with respect to Ms. Calhoun's claims of reprisal—that there is no evidence that Mr. Whitson knew of Ms. Calhoun's EEO complaint (*id.*, p. 8, n. 4), when, in fact, Mr. Whitson had been Ms. Calhoun's supervisor, and had access to her personnel file. (JA___, PA).

Further, although the selecting official testified that Mr. Whitson's directive that she hire Ms. Bradfield was in a context in which she had reason to fear discrimination and retaliation (JA___, PD, pp. ___), the district court relied upon an earlier statement by the selecting official (JA, JM, p. 9), in which the selecting official was not subjected to cross-examination, and which was contradicted by later statements that the selecting official made at both the deposition and the administrative hearing.  (JA___, PD, p. ___, HT, p. ___).  Given this conflicting testimony and the district court's knowledge that Ms. Peterson-Parker still had reason to fear reprisal at the time of her testimony, the district court's blanket dismissal of her later testimony seems extraordinary.

Also, although both the selecting official and the selecting official's supervisor had worked with Appellant and the selectee and knew their strengths and weaknesses, the district court's assertion that the "correctness" of the decision is not at issue, is contrary to the law of this Court.  Rather, when there are major differences between the candidates, and if the witnesses are in a position to appreciate those differences, this Court critically examines the candidates' qualifications.

With respect to two other selections, as the district court fails to note, the selecting official, Stanley Langfeld, was named in Ms. Calhoun's previous complaint. Inexplicably, the district court relies upon Mr. Langfeld's conclusory

35

affidavit.  All credibility determinations are simply tossed to the wind.  The inference that a vastly unqualified non-African-American was selected over two far more qualified African-Americans—one of whom, the most qualified candidate, happened to have filed an EEO complaint, and also happened to be Union President—is swept under the carpet.  The district court, in fact, disposed of that inference as conveniently as Mr. Whitson, after having made his preselection, foisted it upon Ms. Peterson-Parker.

## STANDARD OF REVIEW AND SUMMARY JUDGMENT

The Court of Appeals reviews the district court's grant of summary judgment *de novo* and may affirm only if, viewing the evidence in the light most favorable to the non-moving party and giving him the benefit of all permissible inferences, it concludes that no reasonable jury could reach a verdict in his favor. *Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009); *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 849-850 (D.C. Cir. 2006) (*citing Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)); *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (holding that court should view the evidence in the light most favorable to the non-moving party). Thus, summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed.R.Civ.P. 56(c)*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A genuine issue of material fact exists where the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 252. The initial burden of proving the absence of any material fact, and thus the appropriateness of summary judgment, is on the movant, or Appellant in this

case. *Celotex Corp.*, 477 U.S. at 325. Defendant must proffer a legitimate nondiscriminatory reason for its actions with sufficient specificity to allow Plaintiff to rebut it. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

Ms. Calhoun must show that admissible evidence exists, which shows pretext or other reasons that actually explain Appellant's unlawful, intentional conduct, as alleged by Ms. Calhoun. *Celotex Corp.*, 477 U.S. at 322. Any competing reasonable inferences and conclusions of the existing facts and evidence in the existing record must be drawn in favor of Ms. Calhoun. *Reeves*, 530 U.S. 133 at 150.

The Supreme Court has also made clear that the judge's function is not to weigh the lack of material disputed facts or evidence in the evidentiary record with the purpose of determining the truth of any legal matter. *Anderson*, 450 U.S. at 249. The judge's task is rather to "determine whether there is a genuine issue for trial." *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. *Id.* at 255. It is for this reason that, when reviewing a motion for summary judgment, a court must view all of the evidence in the light most favorable to the nonmoving party. *See Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144. *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005) (citations omitted).

As a consequence, once the court determines that material and disputed evidence exists in this case, and/or that further discovery is warranted to uncover such evidence, summary judgment must be denied. Only the jury can properly resolve such evidence. *Anderson*, 477 U.S. at 248.

Further, this Court must determine whether an Agency's actions "have been arbitrary or capricious, including whether it has acted consistently with its own procedures; and whether its applications of its governing law." *Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997). In cases that concern alleged employment discrimination, Courts accordingly do not conduct any of the burden shifting tests as determined by *McDonnell Douglas Corp. v. Green*, and *Burdine*, until the defendant has shown the absence of any material disputed relevant and genuine facts, and/or, until this Court is satisfied that Defendant in this case has met its initial *prima facie* burden of proof to show the absence of disputed material facts. *Burdine*, 450 U. S. at 255; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792. 802 (1973); *Reeves*, 530 U.S. at 142-143; *Anderson*, 477 U.S. at 247-249; *Celotex Corp.*, 477 U.S. at 322. In Title VII cases, courts should be wary of summary judgment motions because a party's intent is often the crucial element in such cases. *Burdine*, 450 U.S. at 248, 254 (1981).

Ms. Calhoun can alternatively defeat Defendant's motion with direct or indirect admissible evidence that would show pretext or evidence that is unworthy of belief.  Ms. Calhoun can meet her burdens of proof with direct or circumstantial evidence to show that "race, [retaliation], color, religion, sex, or national origin was a[n] intentional motivating factor for any employment practice" made unlawful by Title VII, as amended.  *Desert Palace, Inc. v. Costa*, 530 U.S. 90, 96-105 (2003).

Additionally, in an employment discrimination case, "[u]sually, proffering evidence from which a jury could find that the employer's stated reasons were pretextual will be enough to get a plaintiff's claim to a jury."  *Leavitt*, 407 F.3d at 413.

Ultimately, the question is "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)."  *Waterhouse v. District of Columbia*, 298 F.3d 989, 993 (D.C. Cir. 2002) (citing *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)).

## ARGUMENT & ANALYSIS

### I.    Ms. Calhoun has established a *Prima Facie* Case of Discrimination on the Bases of her Race, Age, and Reprisal.

In the present case, Ms. Calhoun can establish a *prima facie* case of racial and age discrimination by showing:

(1) she was a member of a protected class or classes (Over 40, African-American);

(2) she was qualified for the position for which she applied;

(3) she was not recommended or hired despite her qualifications; and

(4) the job was given to a person outside of her protected group(s) (Under 40, Asian; under 40, Caucasian).  She has also shown that, in the case of the McDonald selection, the position was closed to her, despite her qualifications, and opened to someone else.  *See McDonnell Douglas*, 411 U.S. at 802.

In setting forth these requirements, however, the Supreme Court emphasized that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required ... is not necessarily applicable in every respect to differing factual situations." *Id.* n. 13. In a similar vein, the Court has made clear that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," *Burdine*, 450 U.S. at 253, and that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122

41

S. Ct. 992, 152 L. Ed. 2d 1 (2002) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)).

Further, Ms. Calhoun must "be afforded a fair opportunity to show that [the employer's] stated reason ... was in fact pretext" for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804. The *McDonnell Douglas* framework applies to both Title VII and ADEA claims. *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

Ms. Bradfield, Mr. Holstrom, Mr. Burmeister, and Ms. McDonald are all outside of Ms. Calhoun's protected class. Ms. Bradfield is Asian, and Mr. Holstrom, Mr. Burmeister, and Ms. McDonald are all Caucasian. There has been considerable testimony that Ms. Calhoun was considerably more qualified for the Computer Specialist position than was Ms. Bradfield, and, as has been demonstrated above, Ms. Calhoun also received higher HR rankings than did Mr. Burmeister of Mr. Holstrom. Further, Defendant provided little more than conclusory statements in contending that Ms. McDonald was more qualified than Ms. Calhoun.

As has been demonstrated above, Ms. Peterson-Parker elaborated at length on why Ms. Calhoun was the outstanding candidate, and why Ms. Bradfield was the least qualified.

One especially revealing point was Ms. Peterson-Parker's testimony, noted above, that Ms. Bradfield, the selectee for a position in which

42

> communications and ability to deal with groups outside the Agency
> was an important factor, refused to address an inter-agency gathering:
> "She refused to do so."

(JA, HT, p. 162).

Ms. Peterson-Parker refuted Mr. Whitson's conclusory statements point-by-point, as when she noted that Ms. Bradfield had not been working in a GS-14 capacity:  (*Id.* at pp. 175-177). The district court's finding that "Calhoun has not presented any evidence to refute Whitson's non-discriminatory reasons" (JA___, JM, p. 9) simply ignores this testimony.

Ms. Peterson-Parker also testified that Ms. Bradfield's selection appeared to be a preselection, concerning which there is necessarily an inference of discrimination.  Ms. Peterson-Parker expressly linked this preselection to the discriminatory atmosphere pervasive at Appellee's workplace.  Further, since the selectee was both the least qualified finalist and the only finalist who was not an African-American, her view was that there might well be discrimination.  (*See* JA___, HT, p. 33).

Further, contrary to the assertion of the district court that "[a]t issue is not the correctness of Whitson's decision to hire Bradfield," (JA__, JM, p. 9), this Court has held that "an employer's reason need not be false to be pretextual." *Leavitt*, 407 F.3d at 414.  Since Appellee has provided nothing but Mr. Whitson's conclusory Affidavit to dispute the selecting official's conclusions, there is

43

"nothing to indicate" that Ms. Calhoun's "assessment is either incredible or fanciful." *Id.* This Court balanced testimony in the record contrary to the plaintiff's assessment in *Leavitt* with the plaintiff's performance appraisal and testimony from other workers. *Id.* This Court's holding in *Leavitt* would apply, *a fortiori*, to the testimony of a selection official.

    With respect to the Holstrom, Burmeister, and McDonald selections, the Agency has, again, only offered conclusory statements. Yet, Ms. Calhoun had been in the Division for some time and had been, according to Ms. Peterson-Parker, performing the work of a GS-14. Her credentials demonstrated that she was equipped to handle the policy and analytical demands of the Program Expert positions, and nothing about the Holstrom, Burmeister, or McDonald resumes— and certainly nothing about the conclusory statements offered in support of those selections—demonstrates that these candidates should have been selected over Ms. Calhoun. As this Court has held, "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion," *Leavitt*, 407 F.3d at 414 (*citing Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990), and, *a fortiori*, Ms. Calhoun's detailed testimony, buttressed by Ms. Peterson-Parker's detailed testimony, supports her claim on its own terms—particularly when her claim is juxtaposed with Mr. Whitson's and Mr. Langfeld's conclusory statements.

## II.     Ms. Calhoun has established a *Prima Facie* Case of Reprisal.

Ms. Calhoun may establish a *prima facie* case of reprisal for both her Title

VII and ADEA claims by showing that:

(1) She engaged in a protected activity;

(2) The agency was aware of the protected activity;

(3) Subsequently, she was subjected to adverse treatment by the agency; and

(4) A nexus exists between the protected activity and the adverse treatment.

*See Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007); and *Carter v. GWU*,

387 F.3d 872, 878 (Title VII or ADEA, retaliation claims trigger *McDonnell*

*Douglas* analysis).  If the employer provides a legitimate reason for its actions,

"the burden-shifting framework disappears, and a court reviewing summary

judgment looks to whether a reasonable jury could infer ... retaliation from all the

evidence," which includes not only the *prima facie* case but also the evidence the

plaintiff offers to "attack the employer's proffered explanation for its action" and

other evidence of retaliation.  *Bernanke*, 557 F.3d at 677-680; *Carter*, 387 F.3d at

878 (internal quotation marks omitted).

In this case it is undisputed that:

(1)     Ms. Calhoun engaged in protected activity by filing EEO actions,

        aside from her Union activity;

45

(2)     That the Agency, and specifically, Mr. Whitson and Mr. Langfeld, were aware of the protected activity (at the time of the selections) (again, Mr. Whitson was her supervisor); and

(3)     That Ms. Calhoun was subject to an adverse employment action when she was not selected for any of the positions for which she applied; when she was denied training; and when she received negative evaluations.

### A.     A causal connection exists between Ms. Calhoun's filing of an EEO Complaint, along with her Union activity, and the subsequent non-selections.

Ms. Calhoun contends that she has been denied promotions in a context of 20 years of continuing harassment, continuing resentment by her supervisors of her Union activity, and knowledge by her supervisors of the EEO activity.  Further, the passage of time between the protected activity and the adverse personnel action at issue is **only one** factor to consider in determining whether an inference of reprisal is warranted. The mere passage of a significant amount of time is not sufficient to dissipate the inference if, as in this case, there are other factors present. Thus, a *prima facie* case **can be established** by other evidence tending to establish retaliatory motivation.  *See Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (holding that "close temporal proximity" is not the only factor, that all subsequent protected activity must be considered, and that "[a]t the prima facie stage of a

46

retaliation claim, a plaintiff's burden "is not great; [she] merely needs to establish facts adequate to permit an inference of retaliatory motive") (*citing McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)). As in the instant case, the plaintiff in *Holcomb* "repeatedly engaged in protected activity during the period when she also experienced" the alleged discriminatory action. *Id.* This Court accordingly stated that "we believe she has met this minimal burden and made out a prima facie case of retaliation." *Id.*

In this case, the inference of retaliation is clearly present. Mr. Langfeld was the deciding official in two non-selections, provided Ms. Calhoun with negative evaluations, and denied her training. Mr. Langfeld is also the named RMO in several of Ms. Calhoun's actions. Also, as has been previously noted, Mr. Whitson, as Ms. Calhoun's supervisor, had access to Ms. Calhoun's personnel file, was aware of her EEO activity, and was aware of her Union activity. Contrary to the district court's assertion, this is the type of "circumstantial evidence" which, according to this Court, is sufficient to defeat summary judgment:

> As this Court has recently stated:
>
> To survive summary judgment, however, Jones [the plaintiff] needn't provide direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did. And we have repeatedly recognized that the precise kind of evidence Jones has offered-that 'the *employer* had knowledge of the employee's protected activity, and the adverse personnel action took place shortly after that activity"-is 'adequate to permit an inference of retaliatory motive,' at

47

least at the prima facie stage. *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (internal quotation marks and alteration omitted, emphasis added); *see also id.* (recognizing temporal proximity when employee "traded correspondence" with unidentified "senior [agency] personnel" around the time that her supervisors allegedly retaliated against her); *Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (recognizing temporal proximity when agency had knowledge of employee's protected activity). . .

*Bernanke*, 557 F.3d at 679-80 citations already provided).  To be sure, as this Court then stated, "that such evidence would show intent at the prima facie stage does not resolve the question of retaliation *vel non.*"  *Id.* at 680.  However, it does support an "inference of mere knowledge."

> Yet the reason we deem such evidence sufficient to support a prima facie case-that it tends to support a circumstantial inference of retaliation-applies to the ultimate inquiry as well. Moreover, if such evidence can support an inference of actual retaliatory motive, it necessarily can support an inference of mere knowledge.

*Id.*

### B.     Ms. Calhoun has Shown Retaliation Vel Non.

The disparity between Mr. Calhoun's credentials and those of the selectees, particularly Ms. Bradfield, ultimately supports a finding of retaliation *vel non*.  In *Bernanke*, this Court commented that a district court should proceed to that ultimate issue of retaliation *vel non* instead of evaluating whether Jones made out a *prima facie* case; and that

> [a]t that stage, the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation "either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's

48

> proffered explanation is unworthy of credence." *Aikens*, 460 U.S. at
> 716, 103 S. Ct. 1478 (quoting *Burdine*, 450 U.S. at 256, 101 S. Ct.
> 1089); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C.
> Cir. 1998) (en banc) ("In an appropriate case, ' [t]he factfinder's
> disbelief of the reasons put forward by the defendant' will allow it to
> infer intentional discrimination." (quoting *St. Mary's Honor Ctr. v.
> Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)
> (alteration in original))).

*Bernanke*, 557 F.3d 670, 678-79 (citations already provided). In the instant case, particularly in view of the disparity between the credentials of Ms. Calhoun and the selectees, respectively, as well as the disparity between Ms. Calhoun's and Ms. Peterson-Parker's detailed explanations and Mr. Whitson's and Mr. Langfeld's conclusory ones, a jury should be allowed to weigh the conflicting testimony to see if Appellee's explanation is "worthy of credence," and to determine if it may "infer intentional discrimination."

### III.   Ms. Calhoun Has Established Disparate Treatment.

In demonstrating that she was passed over in favor of less qualified candidates outside of her protected class, Ms. Calhoun has also demonstrated disparate treatment. In order to prove a *prima facie* case of disparate treatment, Ms. Calhoun must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Leavitt*, 407 F.3d at 412 (*citing Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). Although Ms. Calhoun can satisfy the third prong of this test by

49

demonstrating that she was treated differently from similarly situated employees who are not part of the protected class, *Leavitt*, 407 F.3d at 412 (*citing Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999))—as she has by showing that, despite her superior credentials, she was not selected, while the candidates in the non-protected classes were selected—"this is not the only way." *Leavitt*, 407 F.3d at 412.

Rather, Ms. Calhoun can also demonstrate disparate treatment by showing that "the adverse employment action 'is not attributable to 'the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'" *Leavitt*, 407 F.3d at 412 (*citing Stella*, 284 F.3d at 145 (*quoting International Broth. Of Teamsters*, 431 U.S. 324, 358 n. 44 (1977)); *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150-51 (D.C. Cir. 2004)). Further, "[e]limination of these reasons ... is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Leavitt*, 407 F.3d at 412 (*citing Teamsters*, 431 U.S. at 358 n. 44).

## IV.    Ms. Calhoun Has Demonstrated Disputes of Fact, Which Should be Decided by a Jury.

Ms. Calhoun has demonstrated disputes of fact, which should be resolved by a jury. At the very least, Ms. Peterson-Parker and Ms. Calhoun dispute Mr. Whitson's conclusory account of Ms. Bradfield's preselection. As the selecting

50

official, Ms. Peterson-Parker had a particular strong vantage point from which to observe this.  Ms. Calhoun also provided detailed testimony of the hostile work environment to which she had been subjected—resulting from her EEO complaint and her Union activity—by Mr. Langfeld, the selecting official with respect to two non-selections.  These non-selections were the culmination of the Agency's, and Mr. Langfeld's,  denial of training to her, and his belittlement of her work, even though he assigned her GS-14 work while maintaining her status as a GS-14.[9] Thus, Ms. Calhoun has shown a sufficient dispute of facts to warrant sending this case to a jury.

As this Court has held, summary judgment is upheld on appeal only where there is no genuine issue of material fact; and, viewing the evidence in the light most favorable to the appellant, the appellee is entitled to prevail as a matter of law.  *Sherwood v. Washington Post*, 871 F.2d 1144, 1145 (D.C. Cir. 1989) (*citing Byers v. Burleson*, 713 F.2d 856, 859 (D.C. Cir. 1983)).  Ms. Calhoun accordingly "has the benefit of all reasonable evidentiary inferences that can be drawn in [her] favor."  *Sherwood*, 871 F.2d at 1144 (*citing McConnell v. Howard University*, 818 F.2d 58, 59 n. 1 (D.C. Cir. 1987)). The "clearly erroneous" standard of Rule 52(a) is not applicable in connection with a review of a summary judgment.  *Sherwood*,

---

[9] Again, Mr. Langfeld's assertion in his Affidavit that the GS-14 was a typographical error is simply incredible, and casts doubt upon the entire affidavit, aside from its self-serving and conclusory nature.

871 F.2d at 1145 (*citing Toney v. Bergland*, 645 F.2d 1063, 1066 (D.C. Cir. 1981);

*Tygrett v. Washington*, 543 F.2d 840, 844 n. 17 (D.C. Cir. 1974)).

This Court accordingly found that, because it was "faced with genuine issues of material fact, inappropriate for disposal on summary judgment," it should reverse the district court and remand for a trial on the merits. *Sherwood*, 871 F.2d at 1145.

The plaintiff in *Sherwood*, like Ms. Calhoun in the instant case, "contest[ed] defendant's statement of material facts." *Id.* at 1147. This Court accordingly held that a district court cannot do what the district court did here: to wit, "deny the existence of disputes over material facts by making findings of fact and then labeling them 'undisputed..'" *Id.* Nor is the trial court free to make critical findings of fact in deciding a motion for summary judgment, *id.*, as the district court here, in determining that Mr. Whitson did not know of Ms. Calhoun's prior EEO activity, even though (1) he was her supervisor, (2) he had access to her personnel records, with information about her EEO complaint; and (3) she was the Union President. Nor was it proper for the district court to have determined that Mr. Whitson could have made an "incorrect" selection without having acted out of a discriminatory animus.

As this Court has held, "[i]n acting on a motion for summary judgment, '[t]he court's function is limited to ascertaining whether any factual issue pertinent to the controversy exists; it does not extend to resolution of any such issue.'" *Sherwood*,

871 F.2d at 1147 (*citing Nyhus v. Travel Management Corp.*, 466 F.2d 440, 442 (D.C. Cir. 1972) (footnote omitted)).  In the instant case, the District Court failed to follow the *Sherwood* mandate that it either establish that there are no issues of fact or try the case.  As a result, summary judgment should be denied.  *Id.*

**V.      According to the Law of this Circuit, Ms. Calhoun's Vastly Superior Qualifications Provide a Basis for Defeating Summary Judgment.**

As has been held by this Court, in view of Ms. Calhoun's vastly superior qualifications, a factfinder could infer discrimination.  That is, "a factfinder could infer discrimination if the evidence showed a reasonable employer would have found the plaintiff *significantly* better qualified for the job but nevertheless failed to offer the position to her."  *Holcomb*, 433 F.3d at 898 (emphasis in original) (*citing Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1295 (D.C. Cir. 1998)). To be sure, a plaintiff is not required to show just such a disparity, *Holcomb*, 433 F.3d at 898—although Ms. Calhoun has in fact shown such a disparity in the instant case—and may show evidence of discrimination by other means, such as showing that her employer has misstated her qualifications."  *Id.*  Mr. Whitson performed both acts, in that he both failed to select Ms. Calhoun, and claimed, in his conclusory affidavit, that Ms. Calhoun lacked Ms. Bradfield's purported "depth of experience."  (JA___, JM, p. 8).  Thus, Mr. Whitson both selected a vastly inferior candidate, and misstated Ms. Calhoun's qualifications.  Mr. Langfeld,

similarly, both selected inferior candidates, and, also in conclusory fashion,

misstated Ms. Calhoun's qualifications.

Further, the disparity between Ms. Calhoun's qualifications and those of the

selectees is sufficient to establish a "qualifications gap" sufficiently great to be

"inherently indicative of discrimination:

> In order to justify an inference of discrimination, the qualifications
> gap must be great enough to be inherently indicative of
> discrimination. *See Lathram*, 336 F.3d at 1091 (citing a wide and
> inexplicable gulf" between candidates).

*Holcomb*, 433 F.3d at 897 (*citing Lathram v. Show*, 336 F.3d 1065, 1091 (D.C. Cir.

2003)).

In *Lathram*, this Court accepted an inference of discrimination where the

plaintiff, who possessed several years' experience in public affairs, was

"substantially more qualified" than the unemployed former journalist, who was

hired for a higher position.  336 F.3d at 1092.  As was stated by this Court:

> [T]here is evidence from which a reasonable jury could have found
> that Lathram was substantially more qualified than Boyd for the job.
> At the time Customs hired Boyd, Lathram had already been working
> as a Public Affairs Specialist for three years. She specialized in and
> was responsible for drug interdiction issues, and, depending upon
> whose testimony the jury credited, much or all of Boyd's subsequent
> portfolio was work that Lathram had previously been performing.

*Lathram*, 336 F.3d at 1092.  Because a reasonable jury could find that the plaintiff

in *Lathram* was "substantially more qualified" than the selectee, the jury could,

correspondingly, conclude that the employer's assertions to the contrary were

pretextual. *Id.* Thus, the district court's granting of summary judgment on this count "was in error and must be reversed." *Id.*

In *Aka*, this Court determined that the evidentiary record was sufficient for a reasonable jury to conclude that the plaintiff, who was denied a pharmacy technician job, was "markedly more qualified" than the applicant who received the position. 156 F.3d at 1299. *Aka* is analogous to the instant case, in that the plaintiff presented undisputed evidence that he had nineteen years of experience as a hospital assistant as well as bachelor's and master's degrees; the other applicant had no college education; had worked in the hospital laundry for slightly over a year; and had spent only two months as a pharmacy volunteer. *Id.* at 1286, A1295-96.

In the instant case, Ms. Calhoun, *inter alia*, has a higher degree, has worked on policy matters as well as web matters, and has given seminars. Ms. Bradfield, in contrast, was afraid to give one presentation, and yet Mr. Whitson had her selected for a position in which communications skills are highly important. In such a case, as held by this Court, a reasonable juror might not defer to the employer's view, unlike the district court here. The reasonable juror would accordingly find discrimination, since employers do not "consciously" select less-qualified candidates. Thus, although, in a close case, the reasonable juror might defer to the employer,

55

> [T]his does not mean that a reasonable juror would in every case defer to the employer's assessment. If that were so, no job discrimination case could ever go to trial. If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate-something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

*Aka*, 156 F.3d at 1294.

To be sure, Mr. Whitson testified that Ms. Bradfield was the superior candidate, but he did so in a conclusory manner that, as has been noted above, also misstated Ms. Calhoun's qualifications.  Ms. Calhoun's experience also vastly exceeded that of the selectees for the other positions, as has also been noted above.

Further, in *Aka*, this Court noted that the plaintiff, with respect to the "skilled parts" of the job in question, "had a very strong advantage."  *Id.*  at 1297. This Court also noted the *Aka* plaintiff's master's degree in pertinent fields.  *Id.* Rebutting the dissent's claim in *Aka* that there were "no educational prerequisites listed in the job description," this Court also held:

> [R]easonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions. Obviously, they will take additional credentials into account, if those credentials would prove useful in performing the job.

*Id.* In contrast to this Court's view, the district court accepted uncritically Mr. Whitson's inaccurate protestation that Ms. Calhoun's credentials "were based primarily upon education." (JA___, JM, p. 8).

The plaintiff in *Aka*, as this Court noted, also worked closely with professional personnel, and was more familiar with terminology than the selectee. *Aka*, 156 F.3d at 1297. Similarly, in the instant case, Ms. Calhoun gave seminars, and was highly familiar with technical procedures, as opposed to Ms. Bradfield, a former secretary, whose skills were limited primarily to word processing. Under these circumstances, as held by this Court, conclusory, subjective testimonials, such as those of Mr. Whitson and Mr. Langfeld here, are highly suspect:

> . . . courts traditionally treat explanations that rely heavily on subjective considerations with caution. Particularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination.

*Id.* at 1298.

In the instant case, as in *Aka*, there is, for the same reasons as in *Aka*, "sufficient evidence in the record so that a reasonable jury could conclude" that Ms. Calhoun is "markedly more qualified" than the selectees, thereby "throwing into doubt the reason given for [her] rejection." *Id.* at 1299.

## **VI.    An Adverse Inference Should Be Drawn from Appellee's Failure to Answer Interrogatories or Provide Documents over the Course of Years.**

In addition, this Court should draw an inference from Defendant's failure to answer Interrogatories, or produce documents, over the course of several years. The United States Supreme Court has approved the use of the adverse inference rule -- that if the information had been provided, it would have been unfavorable to the Agency and favorable to the opposing party.  *See Insurance Corp. of Ireland v. Compayne Des Bauxites*, 456 U.S. 694, 705 (1982).  As has been held by this Court,

> '[N]egative inferences' . . . may arise when a party fails to call an
> important witness at trial, or fails to produce relevant documents or
> other evidence, and it is shown that the party has some special ability
> to produce such witness or other evidence.

*U.S. v. Hoffman*, 964 F.2d 21, 24 (2d Cir. 1992) (citations omitted).  In the instant case,  the district court simply Appellant's argument here, and ignored Appellee's history of recalcitrance with respect to discovery, altogether.

## <u>CONCLUSION</u>

For the foregoing reasons, the district court's decision to grant summary

judgment to Appellee was legal error that this Court should reverse.

<div align="right">

Respectfully Submitted,

/s/ James L. Fuchs
James L. Fuchs, Esq.
Snider & Associates, LLC
104 Church Lane, Suite 100
Baltimore, Maryland  21208
410-653-9060
410-653-9061 fax
Attorney for Appellant

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P.
    28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains *13,959* words, excluding the parts of the brief
    exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [     ] this brief uses a monospaced typeface and contains [*state the number
    of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
    32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P.
    32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using
    *Microsoft Word 2007* in *14pt Times New Roman*; *or*

    [     ] this brief has been prepared in a monospaced typeface using [*state
    name and version of word processing program*] with [*state number of
    characters per inch and name of type style*].


Dated: <u>March 12, 2010    </u>          <u>/s/ James L. Fuchs            </u>
                                          Attorney for Appellant

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 12th day of March, 2010, I caused this Page

Proof Brief of Appellant to be filed electronically with the Clerk of the Court using

the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

> R. Craig Lawrence
> Claire M. Whitaker
> OFFICE OF THE U.S. ATTORNEY
> 555 4th Street, NW
> Washington, DC  20530
> (202) 514-7159

> *Counsel for Appellee*

I further certify that on this 12th day of March, 2010, I caused the required

number of bound copies of the Page Proof Brief of Appellant to be hand-filed with

the Clerk of the Court and one copy of the same to be served, via UPS Ground

Transportation, upon counsel for the Appellee, at the above address.

/s/ James L. Fuchs
Counsel for Appellant